RECEIVED
2011 JUL 28 PM 3: 13
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA.

ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for COLONIAL BANK, and THE COLONIAL BANCGROUP, INC.,** | Case No. 2:11-cv-610-MHT-WC |
| Plaintiffs, | JURY DEMAND |
| v. | |
| **FEDERAL INSURANCE COMPANY,** | |
| Defendant. | |

## COMPLAINT

Federal Deposit Insurance Corporation, as Receiver ("FDIC-Receiver") for Colonial Bank ("Colonial"), and The Colonial BancGroup, Inc. ("CBG"), for their Complaint against Federal Insurance Company ("Federal") state as follows:

1.  This case arises from Federal's failure to pay for losses as required by three Financial Institution Bonds covering, inter alia: the dishonest and fraudulent acts of two former Colonial employees, Catherine Kissick ("Kissick") and Teresa Kelly ("Kelly") (both of whom have pled guilty to federal criminal bank fraud charges); fraudulent data entries; forgery and extended forgery; and fraudulent input and modification of electronic data.

## PARTIES

2.  Plaintiff FDIC-Receiver is the Receiver for Colonial. FDIC-Receiver is organized and existing under the laws of the United States, specifically 12 U.S.C. § 1811 *et seq.*,

1

and is charged with, among other things, the orderly liquidation of failed banks pursuant to 12 U.S.C. § 1821(d).

3. Plaintiff CBG is a holding company which, until August 14, 2009, owned and controlled Colonial.

4. Defendant Federal is an insurance company incorporated in Indiana with its principal place of business in New Jersey. Federal conducts business in Alabama and may be served through the Alabama Commissioner of Insurance, its agent for service of process in Alabama.

## JURISDICTION

5. Jurisdiction exists pursuant to 12 U.S.C. §§ 1819(a) and (b)(2)(A) and 28 U.S.C. §§ 1331 and 1345.

## VENUE

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

### COLONIAL'S FAILURE – FDIC-RECEIVER'S APPOINTMENT – CBG'S BANKRUPTCY

7. Colonial was, at all times relevant to this Complaint, a depository institution covered by the Federal Deposit Insurance Act as contemplated by 12 U.S.C. § 1811 *et seq.*

8. The Alabama State Banking Department closed Colonial on August 14, 2009.

9. Prior to its closing on August 14, 2009, Colonial was, at all times relevant to this Complaint, owned, affiliated with, and controlled by CBG as CBG's wholly-owned subsidiary.

10. FDIC-Receiver and CBG dispute which of them may ultimately be entitled to retain payment from Federal for the losses sought by this Complaint. The issue of entitlement is

2

before this Court in case numbers 2:10-cv-0198, styled *The Colonial BancGroup, Inc. v. Federal Deposit Insurance Corporation, as Receiver for Colonial Bank*; 2:10-cv-0409, styled *In Re: The Colonial BancGroup Inc.*; and 2:10-cv-0410, styled *The Colonial BancGroup, Inc. v. Federal Deposit Insurance Corporation, as Receiver for Colonial Bank*. Pending settlement or a final judgment of the entitlement dispute in those actions, amounts recovered in the instant action as sought in this Complaint will be deposited into escrow in accordance with orders entered by the United States Bankruptcy Court for the Middle District of Alabama, Northern Division, on November 4, 2010 and December 17, 2010 in *In Re: The Colonial BancGroup Inc.*, Debtor, Chapter 11, Case No 09-32303 (DHW).

11. Upon Colonial's closing, and also on August 14, 2009, the Alabama State Banking Department appointed FDIC-Receiver as the Receiver for Colonial.

12. Pursuant to 12 U.S.C. § 1821(d)(2), FDIC-Receiver is the successor to all rights and claims held by Colonial as of the date of its closing, August 14, 2009.

13. CBG filed for Chapter 11 bankruptcy protection on August 25, 2009 in the United States Bankruptcy Court for the Middle District of Alabama. On June 2, 2011 the bankruptcy court confirmed CBG's second amended plan of liquidation. CBG's affairs and disposition of its assets are now overseen by a plan trustee under the plan.

## FEDERAL'S BONDS

14. At all times relevant to this Complaint, Federal has been in the business of writing Financial Institution Bonds.

15. Three Financial Institution Bonds issued by Federal cover the losses at issue in this Complaint and were in effect at the time the Alabama State Banking Department closed

Colonial: Financial Institution Bond Form A bearing policy number 81158390 DFI ("Form A"), Financial Institution Bond Form B bearing policy number 81910594 DFI ("Form B"), and Financial Institution Electronic and Computer Crime Policy bearing policy number 81260198 DFI ("Electronic and Computer Crime Policy") (collectively, the "Bonds"). True and correct copies of the Bonds are attached as <u>Exhibits A through C</u>, respectively, and incorporated herein by reference. On information and belief, the Bonds were delivered and accepted in Montgomery, Alabama.

16. Colonial and CBG and their affiliates and subsidiaries are insured under the Bonds for covered losses.

17. Form A and the Electronic and Computer Crime Policy were issued for the term March 1, 2009 to March 1, 2010. Form B was issued for the term July 16, 2009 to July 16, 2010.

18. Within the term of each of the Bonds, losses covered under the Bonds were discovered by Colonial and CBG.

19. Form A provides coverage up to the policy limit of liability of $25,000,000.

20. Form B provides coverage up to the policy limit of liability of $500,000.

21. The Electronic and Computer Crime Policy provides coverage up to the policy limit of liability of $25,000,000.

**CATHERINE KISSICK'S DISHONEST ACTS**

22. At all times relevant to this Complaint, Kissick was employed by Colonial as a Senior Vice President and Director of Colonial's Mortgage Warehouse Lending Division.

23. On March 2, 2011, Kissick pled guilty to, among other things, federal bank fraud in the United States District Court for the Eastern District of Virginia.

24. True and correct copies of a Criminal Information filed by the United States, the Plea Agreement signed by Kissick, and the Statement of Facts signed by Kissick, are attached as <u>Exhibits D through F</u>, respectively, and incorporated by reference.

25. In connection with her guilty plea, Kissick admitted that she knowingly and intentionally combined, conspired, confederated, and agreed with others known and unknown to commit the following offenses (in the words of the Criminal Information):

> (a) bank fraud, that is, to knowingly and intentionally execute a scheme and artifice to defraud a financial institution, and to obtain any moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code § 1344;
>
> (b) wire fraud, that is, having intentionally devised and intending to devise a scheme and artifice to defraud a financial institution, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code § 1343; and,
>
> (c) securities fraud, that is, to knowingly and intentionally execute a scheme and artifice to defraud any person in connection with any security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), in violation of Title 18, United States Code § 1348.

26. Kissick, in connection with her guilty plea, admitted that she, along with co-conspirators, knowingly and intentionally:

> (a) Caused Colonial to transfer funds between bank customer Taylor, Bean & Whitaker Mortgage Corp.'s ("TBW") accounts in an effort to hide TBW's overdrafts. (<u>See</u> Kissick Criminal Information ¶ 2a; Kissick Statement of Facts ¶¶ 3, 14.)
>
> (b) Caused Colonial to purchase from TBW mortgage loan assets, via a loan facility called COLB (which was designed for the short-term warehouse

financing of individual mortgage loans), that did not exist or that had been committed or sold to third parties. (See Kissick Criminal Information ¶ 2b; Kissick Statement of Facts ¶¶ 4-5.)

(c) Caused Colonial to purchase from TBW, via a loan facility called AOT (which was designed for the short-term financing of pools of mortgage loans, also called "Trades"), fictitious Trades that contained mortgage loans for which fabricated agreements were created to reflect commitments by investors to purchase them in the near future. (See Kissick Criminal Information ¶ 2c; Kissick Statement of Facts ¶¶ 8-11.)

(d) Caused Colonial to purchase from TBW, via the AOT facility, Trades backed by impaired-value loans and real estate owned for which fabricated agreements were created to reflect commitments by investors to purchase them in the near future. (See Kissick Criminal Information ¶ 2d; Kissick Statement of Facts ¶¶ 12-13.)

(e) "Recycled" fraudulent loans on the COLB facility and fraudulent Trades on the AOT facility to give the false appearance that aged loans and Trades had been sold and replaced by new loans and Trades. (See Kissick Criminal Information ¶ 2e; Kissick Statement of Facts ¶¶ 7, 13.)

(f) Caused Colonial to accept false documents and information. (See Kissick Criminal Information ¶ 2f; Kissick Statement of Facts ¶¶ 5-6, 9-12.)

27. Upon information and belief, Kissick intended to cause a loss.

28. Upon information and belief, Kissick intended to obtain financial benefits for herself and other natural persons as a result of her dishonesty.

29. Kissick received financial benefits including:

- Spa gift certificates;

- Concert tickets; and,

- Donations to charity in Kissick's name as designated and directed by Kissick.

30. On information and belief, Kissick received other and additional financial benefits in connection with her dishonesty.

31.     Lee Farkas ("Farkas"), TBW's Chairman, and Desiree Brown ("Brown"), TBW's Treasurer, received financial benefits as a result of Kissick's dishonesty including:

- Farkas - Access to millions of dollars, which he used to attain and maintain a lavish life style.
- Brown - a "first class" trip to the Bahamas.

32.     On information and belief, Farkas and Brown and other natural persons received other and additional financial benefits in connection with Kissick's dishonesty.

33.     Kissick, in connection with her guilty plea, admitted that she knowingly and intentionally caused false mortgage loan and loan pool data to be recorded in Colonial's books and records to give the false appearance that Colonial had purchased legitimate interests in mortgage loans and pools from TBW through the COLB and AOT facilities.

34.     Kissick, in connection with her guilty plea, admitted that she knowingly and intentionally recorded sham sales of loans and Trades into Colonial's records to hide the fact that numerous assets purportedly backing COLB loans and AOT Trades could not be sold because the assets were either wholly fictitious or consisted of, among other things, impaired-value loans and Real Estate Owned ("REO") that were not eligible for financing under Colonial's COLB and AOT facilities.

35.     The false data and sales referenced in Kissick's guilty plea were recorded in Colonial's computer system.

36.     The false data and sales referenced in Kissick's guilty plea caused funds to be improperly transferred, paid and delivered by Colonial, or caused accounts belonging to Colonial and accounts belonging to TBW to be improperly added, deleted, debited or credited.

37. Kissick performed the acts to which she admitted in connection with her guilty plea.

## TERESA KELLY'S DISHONEST ACTS

38. At all times relevant to this Complaint, Kelly was employed by Colonial as Operations Supervisor and Collateral Analyst for Colonial's Mortgage Warehouse Lending Division.

39. On March 16, 2011, Kelly pled guilty to, among other things, federal bank fraud in the United States District Court for the Eastern District of Virginia.

40. True and correct copies of a Criminal Information filed by the United States, the Plea Agreement signed by Kelly, and the Statement of Facts signed by Kelly, are attached as Exhibits G through I, respectively, and incorporated by reference.

41. In connection with her guilty plea, Kelly admitted that she knowingly and intentionally combined, conspired, confederated, and agreed with others known and unknown to commit the following offenses (in the words of the Criminal Information):

> (a) bank fraud, that is, to knowingly and intentionally execute a scheme and artifice to defraud a financial institution, and to obtain any moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code § 1344;
>
> (b) wire fraud, that is, having knowingly and intentionally devised and intending to devise a scheme and artifice to defraud a financial institution, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code § 1343; and,

(c) securities fraud, that is, to knowingly and intentionally execute a scheme and artifice to defraud any person in connection with any security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), in violation of Title 18, United States Code § 1348.

42. Kelly, in connection with her guilty plea, admitted that she, along with co-conspirators, knowingly and intentionally:

(a) Caused Colonial to transfer funds between TBW's accounts in an effort to hide TBW's overdrafts. (See Kelly Criminal Information ¶ 2a; Kelly Statement of Facts ¶¶ 3, 14.)

(b) Caused Colonial to purchase from TBW mortgage loan assets, via the COLB facility, that did not exist or that had been committed or sold to third parties. (See Kelly Criminal Information ¶ 2b; Kelly Statement of Facts ¶ 5.)

(c) Caused Colonial to purchase from TBW, via the AOT facility, fictitious Trades that contained mortgage loans for which fabricated agreements were created to reflect commitments by investors to purchase them in the near future. (See Kelly Criminal Information ¶ 2c; Kelly Statement of Facts ¶¶ 9-11.)

(d) Caused Colonial to purchase from TBW, via the AOT facility, Trades backed by impaired-value loans and real estate owned for which fabricated agreements were created to reflect commitments by investors to purchase them in the near future. (See Kelly Criminal Information ¶ 2d; Kelly Statement of Facts ¶¶ 12-13.)

(e) "Recycled" fraudulent loans on the COLB facility and fraudulent Trades on the AOT facility to give the false appearance that aged loans and Trades had been sold and replaced by new loans and Trades. (See Kelly Criminal Information ¶ 2e; Kelly Statement of Facts ¶¶ 7, 13.)

(f) Caused Colonial to accept false documents and information. (See Kelly Criminal Information ¶ 2f; Kelly Statement of Facts ¶¶ 5-6, 9-12.)

43. Upon information and belief, Kelly intended to cause a loss.

44. Upon information and belief, Kelly intended to obtain financial benefits for herself and other natural persons as a result of her dishonesty.

45. Kelly received financial benefits including:

- Spa gift certificates;

- Dom Perignon Champagne and other wine;

- Concert tickets; and,

- A "first class" trip to the Bahamas for her and her spouse.

46. On information and belief, Kelly received other and additional financial benefits as a result of her dishonesty.

47. Farkas and Brown received financial benefits as a result of Kelly's dishonesty including:

- Farkas - Access to millions of dollars, which he used to attain and maintain a lavish life style.

- Brown - A "first class" trip to the Bahamas.

48. On information and belief, Farkas and Brown and other natural persons received other and additional financial benefits as a result of Kelly's dishonesty.

49. Kelly, in connection with her guilty plea, admitted that she knowingly and intentionally caused false mortgage loan and loan pool data to be recorded in Colonial's books and records to give the false appearance that Colonial had purchased legitimate interests in mortgage loans and pools from TBW through the COLB and AOT facilities.

50. Kelly, in connection with her guilty plea, admitted that she recorded sham sales of loans and Trades into Colonial's records to hide the fact that the vast majority of assets backing COLB loans and AOT Trades could not be sold because the assets were either wholly fictitious or consisted of, among other things, impaired-value loans and REO that were not eligible for financing under Colonial's COLB and AOT facilities.

51. The false data and sales referenced in Kelly's guilty plea were recorded in Colonial's computer system.

52. The false data and sales referenced in Kelly's guilty plea caused funds to be improperly transferred, paid and delivered by Colonial or caused accounts belonging to Colonial and accounts belonging to TBW to be improperly added, deleted, debited or credited.

53. Kelly performed the acts to which she admitted in connection with her guilty plea.

## LOSSES

54. The total amount of the losses has not been fully quantified in light of the significant scope of the fraud.

55. The losses caused by the dishonest acts of Kissick and Kelly as alleged in this Complaint greatly exceed the policy limits of liability under the Bonds.

## ADDITIONAL FACTS PERTINENT TO COVERAGE

56. A federal search warrant was executed on Colonial on August 3, 2009. Between that date and August 10, 2009, Colonial and CBG discovered losses of the type covered under the Bonds.

57. Notice of loss was given to Federal on August 10, 2009 by David Byrne, General Counsel of Colonial and CBG. Notice was supplemented on September 21, 2009 and October 13, 2009 by Thomas O'Brien, Counsel for FDIC-Receiver.

58. Plaintiffs submitted sworn proofs of loss to Federal by letters dated February 1, 2010.

59. All of the elements, obligations, and conditions precedent required under the Bonds have been met or performed.

60. Federal has neither accepted nor denied the Plaintiffs' claim under the Bonds.

61. TBW sold to Colonial a purported loan to Farkas's associate Welch in the amount of $745,000, which was evidenced by loan documents containing Welch's forged signature.

62. On information and belief, TBW sold or assigned additional loans, certificates or letters of credit to Colonial with forged signatures or endorsements or fraudulent alterations.

63. On information and belief, executives and employees of TBW, without authorization, knowledge or participation by Colonial or CBG employees, accessed the Colonial or CBG computer system and the Colonial or CBG communication system and effected the transfer and payment of funds, credits and debits to TBW and/or its privies or affiliates ("Unauthorized Computer Transactions").

64. On information and belief, the Unauthorized Computer Transactions included, but were not necessarily limited to, transactions for fake loans to or on behalf of Farkas and Farkas's friends and associates.

65. The losses constitute recoverable losses under the Bonds up to the full aggregate policy limits of liability of the Bonds.

66. Federal has failed to investigate the claims and losses in a reasonable or appropriate time or manner. Federal's first acknowledgement of the claim following the submission of the proof of loss was on March 12, 2010, over one month after the proof of loss was submitted. Federal acknowledged the need for a confidentiality agreement and undertook to submit revisions to a draft agreement submitted by FDIC-Receiver in December 2009. Federal's proposal was sent to FDIC-Receiver on April 9, 2010 and included numerous provisions neither

commonly nor appropriately included in such a confidentiality agreement and which the FDIC-Receiver could not reasonably accept.

67. FDIC-Receiver tendered additional proposed confidentiality agreements to Federal on April 23, 2010, May 27, 2010, July 27, 2010, and March 25, 2011. The confidentiality agreements proposed by FDIC-Receiver would give Federal, Federal's counsel, and others assisting Federal in investigating the Bond claims, access to confidential information.

68. While refusing to sign a routine confidentiality agreement, Federal has requested access to documents and has made numerous other document demands that are calculated to cause delay in making a coverage decision and undue expense for the Plaintiffs.

69. FDIC-Receiver has responded to Federal's requests and has inquired about the relevance of many of those requests. Federal has not responded to FDIC-Receiver's inquiries.

70. Federal has demanded access to confidential documents which FDIC-Receiver and CBG are unable to produce without a confidentiality agreement.

71. To date, Federal has declined to enter into any of the proposed confidentiality agreements or offer appropriate confidentiality agreements of its own, and hence FDIC-Receiver and CBG are unable to produce confidential information requested by Federal.

## COUNT I – BREACH OF CONTRACT

72. Plaintiffs hereby adopt, incorporate, and reiterate all of the preceding paragraphs of this Complaint as if fully set forth herein.

73. Losses far exceeding the policy limits of liability under the Bonds have been incurred.

74. Federal has breached its contract as set forth in the Bonds by failing to pay any of covered losses under the Bonds.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that a jury be empanelled to determine all issues of fact and for:

    (a) Judgment against Federal for the aggregate policy limits of liability under the Bonds.

    (b) Judgment against Federal for pre-judgment interest as provided by law.

    (c) Judgment against Federal for costs, reasonable attorneys' fees and other expenses incurred in preparing and prosecuting this breach of contract action.

    (d) Judgment against Federal for any further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury on all issues.

**ATTORNEYS FOR FDIC-RECEIVER:**

**MILLER & MARTIN, PLLC**

By: *Lynda M. Hill*
Lynda M. Hill
ASB 5483N43H

Shelby R. Grubbs
Charles B. Lee
Ryan A. Kurtz
Kelly L. Weston
Jennifer R. Klos
Julia Demetrius

1170 Peachtree Street NE
Suite 800
Atlanta, GA 30309
Tel: (404) 962-6300
Fax: (404) 962-6100

**ATTORNEYS FOR THE COLONIAL BANCGROUP, INC.:**

**LEITMAN, SEGAL, PAYNE & CAMPBELL, P.C.**

By: _____
Andrew S. Campbell
Bar No. ASB-1555-L40A
420 20th Street North
Suite 2000
Birmingham, AL 35203
Tel: (205) 986-5040
Fax: (205) 986-5080


**PARKER, HUDSON, RAINER & DOBBS LLP**

Eric Jon Taylor *(pro hac vice admission forthcoming)*
Bar No. 699966
1500 Marquis Two Tower
285 Peachtree Center Ave. NE
Atlanta, GA 30303
Tel: (404) 523-5300
Fax: (404) 522-8409

16